# AMENDED EXHIBIT 1
# to Declaration of Angelo A. Stio III

(with redactions)

**In the Matter Of:**

In re: Daniel's Law Compliance Litigation

---

**MATTHEW WILLIAM ADKISSON**

*July 30, 2024*

---

*30(b)(6), Confidential*



800.211.DEPO (3376)
EsquireSolutions.com

1    Q.    And when you say discovery requests and

2    searches, was that related to finding documents?

3    A.    Yes.

4    Q.    Anything else?

5    A.    I spoke to them about things beyond

6    that, but -- sorry.  I am not sure I totally

7    understand the question.

8    Q.    Sure.  You said that you spoke to them

9    about discovery requests and I think we said it's

10   document requests, but was there any other type of

11   requests that you spoke to them about with regards

12   to this litigation?

13   A.    My understanding is that my role at a

14   30(b)(6) deposition is to speak as a

15   representative of the company, so I spoke to them

16   to make sure that I could fulfill that obligation,

17   that I had an understanding of certain things they

18   may have known or not known or done or not done so

19   that I could represent on behalf of the company

20   that the employees either knew something or didn't

21   know something or had done or not done something.

22   Q.    Okay.  In the list of employees, are

23   those all the employees that currently work at

24   Atlas that you gave just now?

25   A.    I believe so.



1      Q.    Okay.  You also said you spoke to

2    partners.  Who are those partners?

3      A.    Just people on that same list.  I would

4    use that -- I use that term interchangeably,

5    business partners and employees.

6      Q.    Do the partners have an ownership

7    interest in Atlas?

8      A.    Yes.

9      Q.    Okay.  Are the partners who have an

10   ownership interest in Atlas the same individuals

11   who are all employees?

12     A.    I think everyone on that list could be

13   considered to have an ownership interest in Atlas.

14     Q.    ███████████████████████████████

15   ████████████████████████████████████████████

16   ███████████████████████████████████████████

17   █████████████████████████

18     A.    ██████

19     Q.    ███████████████████

20     A.    ████████████████████████████████████

21   ███████████████████████████████████████████

22   ████████████████████████████████████████████

23   ████████████████████████████████████████████

24   ████████████

25     Q.    Say that again.  I'm sorry.



1      A.    Y Combinator, the startup accelerator.

2      Q.    Okay.

3      A.    Tom Kemp.  And then other individuals.

4  I don't recall exactly.  I haven't looked at the

5  cap table in a while, so I couldn't tell you who

6  else is on there with confidence.

7      Q.    But in terms of entities, Lightspeed

8  and Y Combinator are the two entities that are

9  shareholders or investors in Atlas; is that

10  correct?

11          MR. LEE:  Counsel, I have allowed you

12      to get into the background, but what does

13      this have to do with subject matter

14      jurisdiction?  Is this a discovery deposition

15      or a --

16          MR. STIO:  I'm getting to that.

17          MR. LEE:  -- deposition limited to

18      subject matter jurisdiction?  Please get to

19      it.

20      A.    Can you repeat that last question.

21          (Record read.)

22      Q.    Let me rephrase that.

23          Are Lightspeed and Y Combinator the

24  only entities that are investors in Atlas?

25      A.    There is also Share Capital that is



```
 1  another entity, and then some of the individual

 2  angel investors may have invested through an

 3  entity.  I don't recall.

 4       Q.    Okay.  Do you know the principal place

 5  of business for Lightspeed Venture Partners, where

 6  it's located?

 7       A.    I do not.

 8       Q.    Do you know the principal place of

 9  business for Y Combinator?

10       A.    I'd be speculating.  I don't.

11       Q.    Okay.  Do you know the principal place

12  of business for Share Capital?

13       A.    Again, I'd be speculating.

14       Q.    Do you own the majority share in Atlas?

15       A.    ████████████████████████████████

16  ███████████████████████████████████████

17  ███████████████████████████████████████

18  ████████████████████████████████████

19  ████████

20       Q.    █████████████████████████

21       A.    ██████

22       Q.    ██████████████████████████████████

23  ███████████████████████████████

24       A.    ████████████

25       Q.    Mr. Adkisson, can you give us a little
```



```
 1   bit of your education background.
 2              MR. STIO:  And I would like to mark a
 3         bio that was on LinkedIn.  This is going to
 4         be Exhibit 1.
 5              (Atlas Exhibit 1, Matt Adkisson
 6         LinkedIn bio printout, marked for
 7         identification.)
 8              MR. PARIKH:  Angelo, you are calling it
 9         Atlas 1 or just exhibit?
10              MR. STIO:  Atlas 1.
11         Q.    Mr. Adkisson, have you ever seen this
12   before, which is Atlas 1?
13         A.    I have not.
14         Q.    Okay.  Do you have a LinkedIn account?
15         A.    I do.
16         Q.    Okay.  Do you have any reason to
17   believe that this Atlas 1 isn't a printout of your
18   LinkedIn account?
19         A.    If you would like, I can go through it.
20   Let me -- let me go through it and I will make
21   sure that it's accurate.
22              (Document review.)
23         A.    There are certain parts of it that are
24   obfuscated or not expanded, as I am sure you can
25   see, but generally it seems to be accurate, yes.
```



1       Q.    Okay.  And your undergrad degree, where

2   is that from?

3       A.    I do not have an undergraduate degree.

4       Q.    Okay.  You attended Massachusetts

5   Institute of Technology?

6       A.    I did.

7       Q.    From what years?

8       A.    From 2001 until sometime in 2006 and I

9   did take some time off -- the attendance was not

10  continuous.  Took some time off within those time

11  periods.

12      Q.    Okay.  Did you attend any other

13  colleges?

14      A.    Yes.

15      Q.    What colleges did you attend?

16      A.    Stanford.  Brown.  The Naval War

17  College.  Harvard.  I think those were the main

18  ones.

19      Q.    Got it.  What period of time did you

20  attend Stanford?

21      A.    I believe it was 1998 to 1999 for one

22  semester.

23      Q.    Was that the first college you attended

24  after you graduated from high school?

25      A.    I did not graduate from high school.



1     A.    You would have to ask him.

2     Q.    Okay. Do you have an understanding of

3 why Mr. Rhome left Atlas?

4     A.    You would have to ask him.

5     Q.    But I am asking you if you have an

6 understanding. Do you know?

7     A.    My understanding is that there are

8 parts of his departure that are covered under NDA,

9 so I'm not sure how much I can go into, but my

10 understanding is broadly that he no longer wanted

11 to continue working at the company and the company

12 wanted to go its own way.

13     Q.    Okay. Do you have an understanding of

14 why Mr. Young left Atlas?

15     A.    I would give the same answer for

16 Mr. Young that I gave for Mr. Rhome.

17     Q.    When Mr. Young was a co-founder of

18 Atlas or RoundRobin, what state did he reside in?

19     A.    I believe he resided in California.

20     Q.    And when Mr. Rhome was a co-founder of

21 Atlas, what state did he reside in?

22     A.    I believe he also resided in

23 California.

24     Q.    And when Atlas was founded, what state

25 did you reside in, sir?



```
 1      A.      ███████████████████████████
 2  ██████████████████████████████████████████
 3  ████████████████████████████████████

 4      Q.     Okay.  You said that Atlas was

 5  previously known as RoundRobin Corporation; is

 6  that correct?

 7      A.      In April of 2021 when the entity was

 8  initially incorporated, it was incorporated as

 9  RoundRobin Corporation.

10      Q.     Okay.  When did it change its name?

11      A.     I don't recall the exact dates.

12      Q.     Okay.

13      A.     I think in -- in late 2023 or early

14  2024 we renamed the entity to Atlas Data Privacy

15  Corporation.

16      Q.     Why?

17      A.      We were no longer primarily using the

18  RoundRobin brand.  We were using the Atlas brand

19  and had been using it for some time and wanted to

20  align the entity named with the primary brand that

21  we were using in the market.

22      Q.     Why was the RoundRobin brand selected

23  when you started Atlas?

24      A.      When Atlas started, we thought our

25  market would be young people, Gen Z.  We described
```



1   ourselves as a LifeLock for Gen Z in one way and

2   we wanted a brand that was very business to

3   consumer, B to C, one that felt light, consumer

4   friendly, something that an 18- or 22-year-old

5   might engage with and find interest in, and that

6   was behind the -- partly behind the choice of

7   RoundRobin as the brand and the entity name.

8        Q.   Okay.  What was behind the change to

9   Atlas?

10       A.   Over time we moved away from --

11            MR. LEE:  Let me just lodge an

12       objection first.  Asked and answered.

13            Go ahead and answer again.

14       A.   Over time we moved away from that

15  initial demographic and developed branding and

16  brands and names that we preferred.

17       Q.   What was the demographic that you were

18  seeking to attract with the Atlas name?

19       A.   I don't think Atlas was oriented

20  towards any particular demographic the way that

21  RoundRobin had been.  I think it was simply a

22  single word, something that we thought could

23  become a ubiquitous brand someday, a name people

24  liked.

25       Q.   Were there any other names that



 1   RoundRobin or Atlas went by during its history,

 2   existence?

 3         A.    There were.

 4         Q.    What are the other names?

 5         A.    CrowdShield.  Derivations of Atlas, so

 6   Atlas Privacy, Atlas Protect.

 7         Q.    Any others?

 8         A.    Those are the ones that I can recall.

 9         Q.    Okay.  And who were -- you said "we"

10   changed the name of RoundRobin.  Who are the "we"

11   who changed the name of RoundRobin to ultimately

12   be Atlas?

13         A.    When I say "we" in that context, it

14   would have -- it would have been a rolling

15   discussion culminating in a consensus decision

16   executed by outside counsel to effectuate the

17   change.

18         Q.    So is your testimony that it was you

19   and outside counsel and no other owners or

20   investors in the company at that time?

21               MR. LEE:  Objection.  Mischaracterizes

22         testimony.

23         A.    That's not my testimony, no.

24         Q.    Okay.  So who are the "we" other than

25   outside counsel who were involved in the change of



 1      order and rulings on this topic.  So we'll

 2      see.  Thanks.  Off the record.

 3           THE VIDEOGRAPHER:  Off the record at

 4      11:16.

 5           (Recess was taken from 11:16 to 11:35.)

 6           THE VIDEOGRAPHER:  Back on the record

 7      at 11:35.

 8           (Atlas Exhibit 2, Order dated June 3,

 9      2024, marked for identification.)

10 BY MR. STIO:

11      Q.   Mr. Adkisson, I want to show you what

12 we have marked as Atlas 2.  For the record, it is

13 an order that the court entered on June 3rd, 2024,

14 docket entry number 36 in the case number

15 1:24-cv-03998.  Take a second to look at that.

16           (Document review.)

17      Q.   And when you are ready, if you can turn

18 to page 11.

19      A.   Okay.  I'm on page 11.

20      Q.   Thank you, sir.  So under Atlas 2, page

21 11, paragraph 2, it says that:  "Plaintiffs, on or

22 before July 31, 2024, shall produce a witness

23 under Rule 30(b)(6) of the Federal Rules of Civil

24 Procedure prepared to discuss the following

25 topics."  Do you see that paragraph 2, sir?



```
 1          A.    I do.

 2          Q.    Okay.  I want to go through each of the

 3   topics with you.  Are you prepared to testify on

 4   behalf of Atlas as to subparagraph (a) of Atlas 2,

 5   which the topic is "documents produced in response

 6   to this court order as long as the questions are

 7   relevant to subject matter jurisdiction"?

 8          A.    I am.

 9          Q.    Are you prepared and being offered to

10   testify on behalf of Atlas with regard to topic

11   (b), which is "Atlas's interest in the Daniel's

12   Law rights being asserted in the actions prior to

13   obtaining the assignments"?

14          A.    I am.

15          Q.    Are you prepared to testify on behalf

16   of Atlas with regard to paragraph (c) of Atlas 2

17   on page 11, "Atlas's decision to incorporate in

18   the State of Delaware"?

19          A.    I am.

20          Q.    Are you prepared to testify on the

21   topic which is identified on paragraph --

22   subparagraph (d) of page 11, "the process for the

23   assignments to Atlas by the Covered Persons"?

24          A.    I am.

25          Q.    Are you prepared to testify as to
```



 1  subparagraph (e), the topic on Atlas 2, "the
 2  assignments Atlas purportedly obtained from the
 3  Assignors, including but not limited to, when the
 4  assignments were obtained, how the assignments
 5  were obtained, the number of assignments obtained
 6  and communications about the assignments"?
 7       A.    I am.
 8       Q.    Are you prepared to testify on behalf
 9  of Atlas with regard to subparagraph (f) on page
10  12 of Atlas 2, the topic is "the services that
11  Atlas provides to its users, including the Covered
12  Persons"?
13       A.    I am.
14       Q.    Are you prepared to testify on behalf
15  of Atlas with regard to subparagraph (g) on Atlas
16  2, page 12, the topic "whether there was any
17  consideration by Atlas or any discussion by Atlas
18  with any Covered Persons regarding whether the
19  assignments would in any way impact the
20  jurisdiction of the courts in any of these
21  actions"?
22       A.    I am.
23       Q.    And are you prepared to testify on
24  behalf of Atlas, and being offered to testify on
25  behalf of Atlas, to subparagraph (h) on page 12,



1    the topic "any participation or interest in the

2    above-captioned actions by any purported

3    Assignor"?

4          A.    I am.

5          Q.    Okay.  And I want to go back to page

6    11, sir, of Atlas 2.  Now, page 11 also contains

7    document requests of documents that Atlas was

8    ordered to produce.  Do you understand that the

9    documents that Atlas was ordered to produce start

10   on subparagraph (1), page 9, and go through

11   subparagraph (g) on page 11, sir?

12         A.    Could you say again on page 9 where

13   that starts?

14         Q.    Say that again, sir.

15         A.    Could you say again on page 9 where the

16   list starts?

17         Q.    Yes, it starts on subparagraph (1).

18   See at the top --

19         A.    I see here (a), (b) -- can I take a

20   minute to read through this list?

21         Q.    Certainly.

22               (Document review.)

23         A.    Okay.  I've read through that list.  Do

24   you mind restating the question.

25         Q.    On page 11, the top of the page,



```
 1   paragraph (1) subparagraph (f) states that among

 2   the documents that Atlas was to produce are

 3   "documents in Atlas's possession concerning the

 4   citizenship of any such Defendant as related to

 5   subject matter jurisdiction (excluding basic

 6   contact information)."  See that, sir?

 7        A.    I do.

 8        Q.    Did Atlas perform a search to locate

 9   documents responsive to subparagraph (f)?

10        A.    We did.

11        Q.    Can you describe what you did?

12        A.    We searched all employee inboxes.  We

13   searched our other communication platforms that we

14   use to communicate internally.

15        Q.    Anything else?

16        A.    I verbally asked every employee whether

17   they had any document that would be relevant to

18   this that would not come up in one of those

19   searches.

20        Q.    Anything else?

21        A.    I don't believe so, no.

22        Q.    How did they search for documents

23   responsive to the category under subparagraph (f)

24   of Atlas 2?

25        A.    We have the ability to perform a global
```



1      A.    If I'm understanding your question

2  correctly, it has happened, because, as you know,

3  there are named plaintiffs who are participating

4  in these Complaints.

5      Q.    Were there communications with the

6  named plaintiffs where they advised Atlas "I want

7  to be a named plaintiff"?

8      A.    There were many people who reach out to

9  us and we would direct them to our counsel and

10  counsel worked out the specifics of who -- well, I

11  won't go into that, but counsel was responsible

12  for that area.

13      Q.    So you said there were many people who

14  reached out about being a named plaintiff.  Who

15  were those many people, just any of them?

16      A.    That was not my testimony.

17      Q.    Okay.

18      A.    There were many people who reached out

19  to us feeling very strongly that -- well, there

20  were many people who reached out to us for many

21  different reasons.  For example, between June and

22  December of 2023, we were dealing with about one

23  serious incident within New Jersey per week.

24  Let's define a serious incident as death threats

25  or serious threats of violence targeted at one of



```
 1   our members:  A PBA officer, one of their family
 2   members, a state trooper, one of their family
 3   members, someone like that, and we would respond
 4   and help them as best we could with whatever
 5   situation they were facing.  Oftentimes or
 6   sometimes there were threats that rose to the
 7   level where we wanted to refer an individual to an
 8   attorney to see if there was any additional help
 9   that could be provided, and over the course of
10   time we directed many individuals to our counsel,
11   and my understanding is those discussions led to
12   certain individuals participating as named
13   plaintiffs in the actions.
14        Q.    People, you said, were reaching out
15   between June and December about serious incidents
16   involving a user of Atlas' services; is that
17   correct?
18        A.    I don't -- that's not what I said, but
19   in that time period we were dealing with a very
20   high volume of threat traffic directed at our
21   individuals, our community of law enforcement and
22   judges and prosecutors in New Jersey, and so we
23   had a lot of opportunities to meet with people and
24   hear their stories and in many cases would refer
25   them to our counsel so that they would have
```



1   someone that they could chat with about other

2   options.  Sometimes people would just want to talk

3   and share their story and...

4        Q.    The people you met with were users of

5   your service; correct?

6        A.    Sometimes they were, sometimes they

7   were not.

8        Q.    When you direct them to meet with your

9   counsel, is that counsel representing you in these

10  lawsuits?

11       A.    When people would come in, we would

12  refer them to -- to counsel, not just our counsel,

13  we would refer them to -- but in some cases we

14  would introduce them to our counsel, yes.

15       Q.    Okay.  So let's talk about who is

16  Atlas' counsel that you would refer them to?

17       A.    We have a number of outside firms.

18  Genova Burns, who has -- is no longer outside

19  counsel for us, but was for a certain period of

20  time.  PEM Law.  Boies Schiller.  Morgan & Morgan.

21  Perkins Coie.  Holland & Hart.  Maybe some

22  other -- we have likely some other smaller firms

23  for outside counsel.  I can't recall.

24       Q.    Do you recall any instance when you

25  referred someone to one of these smaller firms



```
 1   that you can't recall?

 2       A.    No.

 3       Q.    You also said that during June and

 4   December 2021 Atlas would respond and help

 5   individuals who were facing serious incidents with

 6   the situation they were facing; correct?

 7       A.    Yes.

 8       Q.    What services did you provide Atlas to

 9   respond?

10       A.    We would try to do whatever we could to

11   help.  Sometimes that took the form of just

12   talking with somebody, meeting with them and

13   sharing our experiences that we had seen with

14   other individuals who went through the same types

15   of situations.  What I have come to learn is when

16   you are targeted as an individual, most people,

17   even though they are very strong and stoic,

18   certainly physically very tough in many cases in

19   law enforcement, that it's a very difficult mental

20   process for them to go through and their world

21   narrows and they feel like they are in the middle

22   of a category 5 hurricane.  It's easy to lose

23   perspective.  It's easy to lose sight of the fact

24   that the hurricane passes and moves on to target

25   somebody else.  So sometimes we would just go out
```

1   and sit with people for a couple hours and talk

2   them through it.

3        Q.    Okay.  So the services -- between June

4   and December 2021 of serious incidents when you

5   provided services, it included talking, meeting

6   with people, sitting down with people, sharing

7   experiences.  Any other services that Atlas

8   provided?

9        A.    We would -- we would connect them with

10  other people who had gone through similar

11  experiences.

12       Q.    Anything else?

13       A.    We would in some cases help connect

14  them with other individuals who might be able to

15  help them, depending on whatever the fact pattern

16  was in their case.

17       Q.    Anything else?

18       A.    We would advise them on cybersecurity

19  best practices, things to look out for related to

20  identity theft.

21       Q.    Anything else you can recall?

22            MR. LEE:  He is still trying to answer

23       your question, sir.  Just give him a second.

24       A.    You are asking me to go back and I want

25  to make sure my answer is responsive.



```
 1                    MR. LEE:  Take your time.
 2          A.    We had cases of doxxing in 2023 where
 3   extremist groups would target specific officers or
 4   state police and they would host their home
 5   addresses and photos of their family members on
 6   domains intended to be gathering points for
 7   violent extremists, and so we would advocate, we
 8   would use our resources and our network to reach
 9   out to the web hosts or the domain registrars in
10   those cases to try to get those websites taken
11   down.
12          Q.    Got it.  Anything else?
13          A.    You know, we provided so many different
14   types of what you might call help to people.  I'm
15   sure that I'm leaving some out.  I'm not sure what
16   this necessarily has to do with subject matter
17   jurisdiction, but let me just say that we did
18   everything we could when we would respond to an
19   incident of an individual having been doxxed to --
20   or a group of individuals having been doxxed or
21   swatted or threatened, we did everything that we
22   thought we could do to help them navigate through
23   that experience.
24          Q.    The specific items or services that you
25   remember sitting here today you testified to;
```



```
 1   correct?

 2        A.    Including the bit I said last, yes,

 3   where I can't -- I'm not sure I could articulate a

 4   list of every service that we provided, but we --

 5   our goal was we did everything we could to help

 6   these individuals once they had been targeted to

 7   help them get through it.

 8        Q.    What do you mean by everything you

 9   could, I just don't understand that, what did you

10   do when you say "everything we could"?

11             MR. LEE:   Asked and answered.

12        A.    I'm not sure I can provide much more of

13   an answer than I already have.

14        Q.    If you go back to Atlas 2, please --

15        A.    Which page?

16        Q.    Page 12, sir.  You are here today with

17   regard to subparagraph (f) on the top of Atlas 2,

18   page 12, to testify as to the services that Atlas

19   provides to its users including Covered Persons;

20   correct?

21        A.    That's my understanding of this

22   deposition, yes.

23             (Atlas Exhibit 3, letter dated June 24,

24        2024, marked for identification.)

25             MR. STIO:   Sorry about that, James.  I
```



```
 1        didn't know it didn't get up to you.
 2              MR. LEE:  What's that?
 3              MR. STIO:  Sorry I didn't throw it far
 4        enough.
 5              MR. LEE:  It's all good.
 6        Q.    I want to show you what's been marked
 7   as Atlas 3.  For the record, it is a June 24th,
 8   2024, letter from PEM Law on letterhead from Rajiv
 9   Parikh, and I will make a representation that this
10   is the format in which we received the letter.
11              MR. PARIKH:  Angelo, is there another
12        page to this?
13              MR. STIO:  That's why I made the
14        representation.  We didn't -- you never sent
15        us the third page.  We don't have it.
16              MS. JONAITIS:  I will represent that in
17        the cases handled by Troutman --
18              THE COURT REPORTER:  I can't hear you.
19              MS. JONAITIS:  Sorry.  In the cases
20        handled by Troutman, all of the letters for
21        June 24th that said they were three pages we
22        only received pages 1 and 2.
23              MR. STIO:  Raj, we also -- there was --
24        other defendants only received 1 and 2 too.
25        We never received the third page.
```



```
 1   counsel to prepare this letter?
 2            MR. LEE:  Objection to form.  Lack of
 3        foundation.
 4        A.   I'm not sure I understand the scope of
 5   the question.  If you mean did we provide some of
 6   the material that would be referenced in here,
 7   then the answer would be yes.
 8        Q.   Did you provide any information with
 9   regard to -- on page 2 --
10            MR. LEE:  Can I just have a standing
11        objection on foundation grounds for all
12        questions related to Exhibit 3, Atlas 3?
13            MR. STIO:  Noted.
14            MR. LEE:  Thanks.
15        Q.   Did you provide any information on page
16   2 with regard to the small number of Covered
17   Persons, as defined in each of the complaints,
18   where assignments to Atlas postdated the filing of
19   the complaint?
20        A.   I think this would get into privileged
21   discussions with counsel.
22        Q.   I don't want the contents.  I want to
23   know if you had those discussions.
24        A.   Could you restate the question.
25        Q.   Sure.  Did you have discussions with
```



 1   regard to the assignments to Atlas that were
 2   obtained after a complaint was filed?
 3        A.    So you are asking me if we ever
 4   discussed those type of assignment confirmations,
 5   I think the answer would be yes, if I'm
 6   understanding your question.
 7        Q.    Okay.  And did you -- other than
 8   counsel, did you have any of those discussions of
 9   assignment confirmations after a complaint is
10   filed with any of the individuals, the assignors?
11        A.    I don't believe so, no.
12        Q.    Did Atlas produce in this case all
13   templates of the assignment confirmations that
14   were sent to the assignors?
15             MR. LEE:  Can you repeat that.  I'm
16        sorry.
17             MR. STIO:  Sure.
18        Q.    Did Atlas produce in this case the
19   templates that were used to send assignment
20   confirmations to the assignors?
21        A.    We produced a template for each type of
22   assignment confirmation that would have been sent
23   to an assignor in one of these cases.
24        Q.    You said "each type of assignment
25   confirmation."  How many types are there?



```
 1          A.    I believe there is a single template
 2   for -- a single template and it's extensible to
 3   cover a phone number or a home address, but I
 4   believe it's just a single template.
 5          Q.    Was there any type of separate template
 6   that was used to send assignment confirmations to
 7   individuals where an assignment was executed after
 8   a complaint was filed?
 9          A.    I'm not aware of one, no.
10          Q.    Okay.  And the template is a template
11   when there is a phone number that's for
12   non-disclosure or a template where there is a home
13   address for non-disclosure, those are two
14   templates that you were mentioning?
15          A.    I'm not sure if you would consider
16   those separate templates if the variation is the
17   piece or the type of data referenced, but I think
18   yes.
19          Q.    Thank you.
20                Are you able to identify, Atlas, who
21   the individuals who received assignments that
22   postdated the complaint are?
23          A.    So you are asking me could we for each
24   separate action identify within that action
25   individuals who had an assignable claim but the
```



 1  assignment did not occur until after the action

 2  was filed?

 3        Q.    Correct.

 4        A.    Yes.

 5        Q.    Can you explain how you would get that

 6  information?

 7        A.    We are the ones sending assignment

 8  confirmations and our system understands the date

 9  on which a Daniel's Law takedown notice was

10  delivered to a particular recipient and who had

11  sent that notice, the covered person who had sent

12  the notice for whom we delivered it, putting those

13  pieces of information together we can understand

14  individuals who would fall into the category that

15  you are talking about.

16        Q.    Did you look at any documents that

17  identified the volume of individuals who received

18  an assignment confirmation after a complaint was

19  filed?

20        A.    I didn't look at any specific documents

21  to prepare for this deposition, but my

22  understanding is that it is a small number of

23  covered persons.

24        Q.    What's your definition of a small

25  number?



```
 1          A.    Less than 50 people across 142 cases
 2    in aggregate.  So not 50 people per case, but less
 3    than 50 people across all of the 142 cases.
 4          Q.    Atlas -- does Atlas have a relationship
 5    with the New Jersey State Police Benevolent
 6    Association?
 7          A.    We do.
 8          Q.    Okay.  Can you describe what that
 9    relationship is?
10          A.    They are a client of ours.  We have a
11    business relationship with them whereby they pay
12    our -- they pay us a service fee and we provide
13    access to the Atlas platform to their members.
14          Q.    How did the New Jersey State Police
15    Benevolent Association become a client of Atlas?
16          A.    They expressed an interest in the type
17    of services that we were providing and they
18    invited us to come and chat with them and we did,
19    and that ultimately led to a business
20    relationship.
21          Q.    Did Atlas reach out to -- can I use the
22    word "PBA" for --
23          A.    Uh-huh.
24          Q.    Did Atlas reach out to the PBA to have
25    these discussions or was it the other way around?
```



1     A.     I believe that I may have -- well, let

2   me back up.  When we decided to explore Daniel's

3   Law, when we learned about Daniel's Law and

4   decided to explore providing services that would

5   be relevant to Daniel's Law, as is typical in my

6   business of going into a new field that you don't

7   know much about where you don't know anyone, I

8   made a number of cold calls, maybe a few dozen,

9   people I thought might be relevant to helping us.

10  Somehow in that process I got in touch with

11  somebody at the PBA.  I don't recall who.  That

12  conversation was fairly brief.  It allowed me to

13  explain who we were, what we were hoping to do,

14  what our background was, and that was the end of

15  that chain of communication.

16     Q.     Got it.

17     A.     ███████████████████████████████

18  ███████████████████████████████████████████

19  ███████████████████████████████████████████

20  ██████████████████████████████████████

21  ████████████████████████████████████████

22  ███████████████████████████████████████████

23  ████████████████████████████████████

24  ████████████████████████████████████

25  ████████████████████████████████████████████



 1  like that, and it became common practice any time

 2  we started an entity of this type to put it in

 3  Delaware.

 4       Q.    How many times have you incorporated an

 5  entity in Delaware?

 6       A.    What do you mean by "incorporated"?

 7       Q.    I want to use the definition you said

 8  in your answer.  You have incorporated numerous

 9  entities in Delaware.  How many have you

10  incorporated?

11       A.    So when I use that -- that term in that

12  way, this is similar to the definition of founder

13  or co-founder.  As I understand it, there are

14  different ways in which one might, quote unquote,

15  incorporate, so for instance, one could file

16  incorporation paperwork directly with the

17  Secretary of State, one could direct their lawyers

18  to incorporate in a certain jurisdiction, one

19  could be involved in discussions as part of a

20  founding team to start a company that ended up

21  being incorporated in Delaware.  So using that

22  definition of early-stage involvement where I had

23  some input into where the jurisdiction or state of

24  residence of the entity should be, I would say I

25  have incorporated or participated in the



1  incorporation of probably twenty companies in

2  Delaware.

3      Q.    Who made the determination of the

4  65 percent/35 percent net split outlined in

5  Atlas 4 under revenue share or recoveries under

6  the assignment confirmations?

7          MR. LEE:  That's privileged.

8      A.    I think that would get into what we

9  talked about before, which is discussions with

10  counsel.

11         MR. STIO:  Okay.  Are you instructing

12     him not to answer the question who made the

13     determination of the split?

14         MR. LEE:  I am telling him not to

15     answer to the extent that it waives

16     privilege.  He just answered that question.

17         MR. STIO:  You can answer the question

18     then.

19         MR. LEE:  He just did it.

20     A.    It would take -- the answer to get into

21  any more specificity would take me into areas of

22  privilege.

23      Q.    In Atlas 4 the paragraph above Recovery

24  Share on Recoveries Under Assignment

25  Confirmations, it's entitled Assignments - Actions



 1 | where Atlas or its affiliates are the plaintiff.
 2 | Do you see that, sir?
 3 |      A.   You are talking about -- I'm not sure
 4 | if this is a numerette, but where the -- where it
 5 | says (ii) in parentheses Assignments?
 6 |      Q.   Assignments - Actions where Atlas or
 7 | its affiliates are plaintiffs.
 8 |      A.   Yes, I see that.
 9 |      Q.   Okay.  There is a provision here --
10 | one, two, three, four, five, six, seven, eight,
11 | nine -- ten lines down where it says in part, if
12 | you want to follow along with me:  The Assignee
13 | will have the exclusive right to bring such civil
14 | enforcement actions anywhere in the world with
15 | respect to takedown notices.  Do you see that?
16 |      A.   Am I allowed to mark this up?  And, if
17 | so, could you get a pen?  It might make it a
18 | little easier for me to follow along.
19 |           MR. LEE:  Why don't you use my copy.
20 |           THE WITNESS:  Okay.
21 |           MR. LEE:  That's the official copy.  I
22 |      will sit with you.
23 |      Q.   Would it help if I pointed it out to
24 | you?
25 |      A.   Sorry, Mr. Stio.  Yeah, you said the



1  counsel that we engaged may have provided feedback

2  on any documents of this type.  More than that I

3  cannot say.

4      Q.    Was Boies Schiller involved in

5  providing feedback on Atlas 4?

6      A.    Again, I'm gonna just be -- I'm gonna

7  say what I said before, which is I'm not

8  comfortable getting into that, into those

9  discussions with our counsel.

10          MR. STIO:  Are you instructing him not

11     to answer?

12          MR. LEE:  He is answering your

13     question.

14          MR. STIO:  He is not.

15     Q.    Mr. Adkisson, I am not asking you for

16  any type of legal communications you had.  Who,

17  what counsel, drafted Atlas 4?

18     A.    I feel like I've answered that question

19  to the best of my ability.

20     Q.    Okay.  Can you repeat the answer then,

21  because I don't recall you answering it.

22     A.    Any number of outside counsel could

23  have provided feedback on this document.  To go

24  into the specifics of who, what, why, where and

25  when, I think, would be getting into areas of



 1  privilege that I would be uncomfortable answering.
 2       Q.   I am not asking you what, why, where,
 3  when, I am asking you who, and you still haven't
 4  answered it.  What are the names of the firms that
 5  drafted Atlas 4?
 6            MR. LEE:  You can answer that specific
 7       question if you recall.  Just that narrow
 8       question.
 9       A.   I don't recall.
10       Q.   Are you aware of any named plaintiff in
11  any of the cases that are the subject of today's
12  deposition that has a counsel that's different
13  than the counsel representing Atlas?
14       A.   Sorry.  Would you repeat that one more
15  time.
16       Q.   Sure.  Is there any attorney of a named
17  plaintiff in the cases captioned in the Order as
18  Atlas 2 that is being represented by a counsel
19  different than a counsel that's representing
20  Atlas?
21       A.   What do you mean by "represented by"?
22       Q.   Have they engaged a lawyer to represent
23  them in the litigation other than Boies Schiller,
24  Morgan & Morgan or Genova Burns or PEM Law, that
25  you are aware of?



```
 1              MR. LEE:  The named plaintiffs?
 2              MR. STIO:  Correct.
 3       A.    So would any of the named plaintiffs --
 4  so the named plaintiffs are two Jane Does, Edwin
 5  Maldanado, the Maloneys, Pat Colligan, Pete
 6  Andreyev, William Sullivan, have any of those
 7  individuals retained counsel other than the four
 8  firms you mentioned for the purposes of
 9  representing them in these actions, in these
10  lawsuits?
11       Q.    Correct.
12       A.    Not to my knowledge, no.
13       Q.    Atlas prepared a spreadsheet showing
14  the date when assignment confirmations were sent
15  out that was produced in this case; correct?
16       A.    Yes.
17       Q.    And you prepared one for each of the
18  data broker litigations or credit reporting
19  agencies that they are involved in; correct?
20       A.    My understanding is that we produced an
21  assignment confirmations list for each of the
22  defendants in federal court.
23       Q.    Do you recall the date when the
24  assignment confirmations were sent out to any of
25  the covered people?
```



1   A.   There was no one particular date when

2   assignment confirmations would have been sent to

3   covered persons.  It's a process that occurs over

4   time on a rolling basis.

5   Q.   Is it an automated process?

6   A.   Parts of it are automated and parts of

7   it are manual and require a human to be in the

8   loop.

9   Q.   Do you know when the assignment

10  confirmations began to be sent out?

11  A.   I believe it would have been in early

12  February.

13  Q.   You said it was a multi-day process; is

14  that correct?

15  A.   Well, if you ask when was -- when were

16  assignment confirmations sent to covered persons,

17  there is no one point in time when that occurs,

18  because you are asking about a continual process

19  that could occur any time that there are

20  assignment confirmations that need to go out.

21       MR. LEE:  Are we done with this one,

22  Angelo?

23       MR. STIO:  Not yet.  Just hold it out

24  there.

25       (Atlas Exhibit 5,



1  as Atlas 5 has an inaccurate date for the date of

2  assignment confirmation.  Is it your testimony

3  that you cannot answer that question?

4       A.   I feel like I did answer that question.

5  I -- if you are asking if I have any reason to

6  believe that the individuals who worked on this

7  would not have produced information, I guess --

8  sorry.  Could you -- I just want to make sure I am

9  clear and accurate in my answer.  Would you mind

10  re-asking the question.

11       Q.   Yes.  The documents that Atlas produced

12  that show a list of assignments and assignment

13  confirmations for each individual action, is the

14  information in those documents accurate?

15       A.   I have no reason to believe that it is

16  not accurate.

17       Q.   Under the terms of service, which I

18  believe is Atlas 4, if you could jump back to

19  that, sir.

20       A.   Okay.  I'm on Atlas 4.

21       Q.   If you can go to ATLAS underscore

22  REMAND 00000003.  Under Daniel's Law it covers

23  former, active or retired judicial officers, law

24  enforcement officers; correct?

25       A.   Are you asking me about what's on this



1   page or are you asking about my understanding of

2   Daniel's Law, the statute?

3        Q.    Starting with your understanding of

4   Daniel's Law, the statute.

5        A.    My understanding of Daniel's Law is

6   that it creates a category of what it deems

7   covered persons to whom it grants certain safety,

8   security rights, privacy rights, and that that

9   group includes former or active, it I think

10  reverses those, so active or former judges,

11  prosecutors and law enforcement officers and any

12  immediate family member, and I believe that --

13  that's my understanding of the statute, that's

14  right.

15       Q.    Atlas as an entity isn't a covered

16  person under the Daniel's Law; correct?

17       A.    Atlas the corporate entity?

18       Q.    Yes.

19       A.    No, we would not be a covered person.

20       Q.    The terms of service in Atlas 4, are

21  they available anyplace else other than on the

22  website for Atlas?

23            MR. LEE:  Objection.  Vague.

24       A.    Are they available anywhere other than

25  on the website?  Yes.



1     Q.    Where are they available, sir?

2     A.    During the sign-up process individuals

3  have the option to download a copy of the terms of

4  service and we know that individuals have done

5  this.

6     Q.    How do you know that?

7     A.    I think we record the -- or either we

8  or the clickwrap provider would record when that

9  action is taken.

10    Q.    I want to go to the section on Atlas 4

11 under assignment confirmations.

12    A.    Do you have a page number?

13    Q.    I will get you that, sir.  000006.

14    A.    Okay.  I'm on page 6.

15    Q.    Can you walk me through the process of

16 how the assignment confirmation is issued and then

17 accepted by the assignors?

18    A.    Upon signing up with Atlas and being

19 presented with this terms of service, a user would

20 presumably I think in the cases you are asking

21 about have accepted this terms of service.  This

22 terms of service makes a provision for Atlas to

23 send that individual an assignment confirmation,

24 which causes their claim to be assigned to Atlas

25 or a designated affiliate.  Sometime after



 1   accepting this terms of service utilizing the

 2   services an Atlas -- excuse me -- an assignment

 3   confirmation could be sent to that individual,

 4   which would cause their claim to be assigned.

 5       Q.    Is there a clickwrap agreement or any

 6   type of agreement associated with the assignment

 7   confirmation?

 8       A.    If by assignment confirmation you mean

 9   the notice that under the terms Atlas has to

10   provide to the individual to effectuate the

11   assignment, there is no clickwrap involved in that

12   process, no.

13       Q.    Is there any other type of agreement

14   involved in that process?

15       A.    The terms of service here.

16       Q.    Okay.  With regard to the terms of

17   service, if there is a change in the terms of

18   service, is there a clickwrap agreement with

19   regard to acceptance of changes?

20       A.    My understanding is that the terms of

21   service allows for updates that would be binding

22   on the individuals who had previously agreed to

23   the terms.  There are instances where an

24   individual might re-engage with a certain portion

25   of the Atlas platform and they would be presented



```
 1   with the updated terms of service and it would
 2   have a clickwrap included as part of that process.
 3        Q.   If there is a change to the terms of
 4   service, is there any notice given to the
 5   assignors?
 6        A.   So you are asking if there is a change
 7   to the terms of service, is there any notice that
 8   we provide to assignors, meaning covered persons
 9   whose claims have been assigned?
10        Q.   Or just any -- let's make it even
11   easier.  A user of the Daniel's Law services, if
12   there is a change in the terms of service, is
13   there a notice that goes out that there is a
14   change?
15        A.   We would post the updated terms of
16   service in all the relevant areas where it would
17   need to be included in our platform.
18        Q.   Other than that, is there any type of
19   notice?
20        A.   Not -- not a universal notice, which I
21   think is what you are asking about, no.
22        Q.   And in terms of the clickwrap
23   technology that you use for acceptance of the
24   terms of service, has that clickwrap been in
25   effect since Atlas was created or incorporated?
```



MATTHEW WILLIAM ADKISSON  30(b)(6), Confidential                July 30, 2024
In re: Daniel's Law Compliance Litigation                                    123

1        A.    No.

2        Q.    When did it go into effect?

3        A.    I don't remember the specific date.  My

4   best recollection is sometime in late 2022 or

5   maybe very early 2023.

6        Q.    Is there a document or record that

7   would tell you when that went into effect?

8        A.    We have a contract with the vendor.

9   I'm sure there is a date on that contract.

10            (Atlas Exhibit 6, Atlas Privacy Order

11       Form, Bates stamped ATLAS-REMAND_00000369

12       through ATLAS-REMAND_00000373, marked for

13       identification.)

14       Q.    I want to show you what's been marked

15   as Atlas 6.

16       A.    I see Atlas 6 here.

17       Q.    Okay.  It is a document with Bates

18   label ATLAS-REMAND 0000369 through 373.  Do you

19   see that, sir?

20       A.    I see the first page I have is 369 and

21   the last page I have is 373.

22       Q.    ████████████████████████████████

23   ███████████████████████████████

24       A.    ██████████

25       Q.    ████████████████████████████████



1    Q.    Did anyone at Atlas have discussions

2    with them about choice of venue?

3        A.    Not to my knowledge.

4            MR. LEE:  We have gone an hour and

5        fifteen.

6            MR. STIO:  I want to finish one more

7        thing and then we can take a break.

8            MR. LEE:  Are you okay to go a little

9        longer?

10           THE WITNESS:  All good.

11           (Atlas Exhibit 8, Atlas Privacy Order

12       Form, Bates stamped ATLAS-REMAND_00000379

13       through ATLAS-REMAND_00000383, marked for

14       identification.)

15       Q.    I am going to show you what's been

16   marked as Atlas 8.  Bates numbers are ATLAS-REMAND

17   underscore 0000379 through 383.

18       A.    I have number 8.  The first page is 379

19   and the last page is 383.

20       Q.    Do you know what Atlas 8 is?

21       A.    This looks to be an agreement with the

22   New Jersey State PBA Local 105.

23       Q.    That's your signature on the bottom of

24   page 1 of Atlas 8?

25       A.    Yes.





```
 1      Q.    ████████████████████████████
 2   ███████████████████████████████████
 3   █████████████████████
 4      A.    ███████████████████████████
 5   ████████████████████████████████████
 6   ████████████
 7      Q.    ███████████████████████████
 8   ████████████████████████
 9      A.    ████████
10      Q.    █████████████████████████████
11   █████████████
12      A.    ███████████████████████████
13   ██████████████
14      Q.    ███████████████████████████
15   ████████████████████████████████████
16   ███████████████
17      A.    ████████████████████████
18   ████████
```

19      Q.    On page 5 of Atlas 8, do you recall any

20   discussions about the venue and jurisdiction

21   provision in Atlas 8?

22      A.    I think in this case, as the others,

23   neither we nor they cared for this choice of

24   venue.  I can't recall any discussion with them on

25   this point.



1    Q.    Do you know how the New York choice of
2    venue got put in this agreement?
3    A.    I do not.
4    Q.    Do you know how many members of the
5    Local 105 signed up for Atlas' services?
6    A.    Sorry.  Just to finish my answer on the
7    last question, given that we didn't particularly
8    care about the choice of venue and neither did
9    they, I imagine that New York County in this
10   document was simply part of the template that
11   became kind of the default that we would use, but
12   I'm not really sure.  Sorry.  What was the last
13   question you asked me?
14   Q.    How many members of Local 105 signed up
15   for Atlas' services?
16   A.    I couldn't tell you.
17   Q.    Is it less than 4,100 as outlined in
18   the agreement of how many you would make
19   available?
20   A.    ████████████████████████████████
21   ███████████████████████████████████
22   ████████████████████████████████████████
23   ████████████████████████████
24   ████████████████████████████████████
25   ████████████████████████████████████



```
 1   more claims that were assigned; correct?
 2        A.    We would not send an assignment
 3   confirmation to an individual who we did not
 4   believe had a claim that could be assigned.
 5        Q.    And Atlas believes that it now has the
 6   right to bring all of those assigned claims in
 7   this litigation; correct?
 8        A.    We filed the litigation.  I'm not
 9   sure -- when you reference rights, legal rights
10   and terms like that, that's where I would say,
11   again, I'm a lay person, so I can't speak to all
12   the legal rights that Atlas may have.  I would
13   defer to my counsel on that.
14        Q.    You are saying you don't know if you
15   have the right to bring the assigned claims in
16   this litigation?
17             MR. LEE:  Objection.  Mischaracterizes
18        testimony.
19        A.    That's not the way I understood your
20   question.  Do you mind repeating the previous
21   question?
22        Q.    Do you believe that Atlas has the right
23   to bring each of the claims that you say was
24   assigned to Atlas by the covered persons?
25        A.    If I'm understanding your question
```



```
 1   correctly, do I believe that Atlas having been
 2   assigned claims under Daniel's Law has the right
 3   to go to court and prosecute those claims, the
 4   answer is yes.
 5        Q.    And in fact, in the various lawsuits
 6   here, you are pursuing each one of those assigned
 7   claims; correct?
 8        A.    No.  There are assigned claims that
 9   are -- maybe I am misunderstanding your question.
10   There are claims that have been assigned that are
11   not part of these lawsuits.
12        Q.    But the claims in these lawsuits that
13   have been assigned you are pursuing; correct?
14        A.    What do you mean by "in these
15   lawsuits"?
16        Q.    The claims at issue in the lawsuits you
17   have commenced to date, Atlas is pursuing all of
18   them together; correct?
19        A.    I don't know what you mean by
20   "together," and again, the reason I am trying to
21   be very precise is that there are some edge cases,
22   for instance, we talked earlier about there being
23   a small number of individuals who were sent
24   assignment confirmations after the filing date of
25   a particular case and, you know, I think I had
```



1   said fifty or less across the entire swath of

2   cases, so when you ask a question, I am trying to

3   be very precise, I am trying to understand what

4   the scope and bounds of your question are, which

5   is why I am taking my time to think through it.

6        Q.    Okay.

7        A.    But --

8        Q.    Go ahead.

9        A.    Could you -- so with that as the

10  preface, if you could reask the question, I'll --

11       Q.    Just take my -- my case, one case.

12       A.    That's helpful if you ask me a question

13  about a specific case.

14       Q.    Okay.  Atlas purports to be the

15  assignee of over 19,000 claims in my case;

16  correct?

17       A.    I don't have your case in front of me,

18  so I'm not sure if it's 19,000, but let's say in

19  the ballpark, yes.

20       Q.    And in that case Atlas is pursuing each

21  one of those assigned claims; correct?

22       A.    I'm not trying to be difficult.  Again,

23  when you say "pursuing each one of those assigned

24  claims," we are taking action as Atlas with all of

25  these claims having been assigned to us and we are



1    attempting to prosecute them all to achieve

2    compliance and a just outcome for the folks

3    involved.

4         Q.    Okay.  If Atlas thinks that any one of

5    the covered persons' claims should be aggregated

6    and prosecuted under subsection (ii) and decides

7    it wants to send an assignment confirmation for

8    any of those covered persons, how does it

9    determine which claims it wants to aggregate?

10        A.    I'm sorry.  Could you ask that question

11   again.

12              MR. CHEIFETZ:  Read it back, please.

13              (Record read.)

14        A.    As I understand your question, you are

15   asking the same question that was already

16   substantively answered, which is how do we decide

17   who to --

18        Q.    Let me rephrase.

19        A.    -- send assignment confirmations to?

20        Q.    Different question, so let me make it

21   clear.

22              Why were -- you had 19,000 some-odd

23   assignment confirmations that went out shortly

24   before these lawsuits; correct?

25        A.    No, I'm not sure that's correct.  I



1    Q.    -- lawsuits, has Atlas received any

2    ████████████████████████████████████

3    covered person, assignor, inquiring about pursuing

4    these claims as a class action as opposed to as a

5    grouping of up to 19,000 assignments?

6    A.    So if I am understanding your question,

7    ██████████████████████████████████████████

8    ██████████████████████████████████████

9    can -- whether a class action may have something

10   to do with these claims.  I can't recall any

11   instances of that, no.

12   Q.    Okay.  I want to switch subjects a

13   little bit, ask you just a couple of questions

14   about the split of fees.  I know you have got some

15   questions about that earlier, but the terms of use

16   and the split of fees of 65 percent/35 percent.

17   Well, okay.  Just to close the loop on that, I

18   asked about phone calls.

19          E-mails or other types of

20   communications related to any of these covered

21   persons, assignors, asking about class actions as

22   opposed to the mass grouping of up to 19,000

23   claims?

24   A.    Again, this is not part of the scope

25   that I prepared for, but I cannot think of any



 1 | instances of that offhand, no.
 2 |      Q.    All right.  So on the split of fees,
 3 | 65 percent to the covered person, 35 percent to
 4 | Atlas, you mentioned earlier that the split of
 5 | fees is privileged litigation strategy.  Did I
 6 | hear that correctly?
 7 |      A.    Well, some language laying out some of
 8 | what you are talking about is publicly included in
 9 | the terms of service, which is a document that is
10 | not privileged.
11 |      Q.    Why did Atlas choose to let the covered
12 | persons keep 65 percent?
13 |           MR. LEE:  Asked and answered.  Object
14 |      to form.
15 |      A.    Again, any -- any discussions around
16 | the -- around those types of terms I would view as
17 | part of litigation strategy and it would fall into
18 | that privileged area.
19 |      Q.    Was that percentage, 65 percent,
20 | negotiated with any of the covered persons?
21 |      A.    I'm not sure what you mean by
22 | "negotiated."  When a covered person chose to sign
23 | up with our platform, they went through that
24 | sign-up flow that I talked about earlier, and they
25 | had an opportunity to review and then agree or not



1  agree to the terms of service, and in the process

2  of that review they could have made a choice based

3  on what they saw to agree or not agree.  I don't

4  know if you would consider that a negotiation or

5  if that's part of what you mean by your question,

6  but...

7       Q.    Was there any -- there was no

8  conversation where a covered person said I want

9  72 percent and Atlas said well, we are only giving

10  you 65 percent, the covered persons either have to

11  accept the 65 percent and agree to the terms or

12  not use Atlas' platform; correct?

13       A.    Well, the only way to get access to the

14  Atlas platform -- maybe it's worth stating.  The

15  Atlas platform will provide a different experience

16  to someone who is a covered person versus somebody

17  who is not a covered person.  So, for example, we

18  have law enforcement officers outside of

19  New Jersey that we help and have tried to help for

20  a long time.  We have --

21       Q.    And I don't mean to interrupt, but I am

22  just asking about covered persons.

23            MR. LEE:  You can finish what you were

24       saying.  He does mean to interrupt.

25       A.    It's responsive to your question.  Bear



```
 1              C E R T I F I C A T E

 2

 3   STATE OF NEW YORK    )

 4                        ) ss.:

 5   COUNTY OF NASSAU     )

 6

 7           I, KRISTIN KOCH, a Notary Public

 8       within and for the State of New York, do

 9       hereby certify:

10           That MATTHEW WILLIAM ADKISSON, the

11       witness whose deposition is hereinbefore

12       set forth, was duly sworn by me and that

13       such deposition is a true record of the

14       testimony given by such witness.

15           I further certify that I am not

16       related to any of the parties to this

17       action by blood or marriage; and that I am

18       in no way interested in the outcome of this

19       matter.

20           IN WITNESS WHEREOF, I have hereunto

21       set my hand this 5th day of August, 2024.

22

23

24

25           KRISTIN KOCH, RPR, RMR, CRR
```

